IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TINA LASHEIL STARGEN, | ) | CASE NO. 5:17-CV-985 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tina Lasheil Stargen ("Stargen") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Stargen filed for SSI in January 2001, and was awarded benefits effective January 1, 2001. Tr. 147. She was found disabled because she met the listing for affective disorders. Tr. 180, 287. In 2013, the Agency's Cooperative Disability Investigation Unit ("CDIU") began investigating Stargen. Tr. 180. On December 11, 2013, the Agency notified Stargen that it was revising its original 2001 finding and was now finding that she was not disabled. Tr. 147, 187. Stargen appealed but her appeal was denied. Tr. 196, 198, 203. Stargen requested an administrative hearing and a hearing was held before Administrative Law Judge ("ALJ") Charles

1

Shinn on April 26, 2016. Tr. 1098-1130. In his May 27, 2016, decision (Tr. 147-170), the ALJ determined that, prior to January 1, 2010, Stargen did not have a medically determinable impairment (Tr. 150), and that, as of January 1, 2010, Stargen did have medically determinable impairments that were severe (Tr. 155). The ALJ concluded that there are jobs in significant numbers in the national economy that Stargen could perform, i.e. she is not disabled. Tr. 169. Stargen requested review of the ALJ's decision by the Appeals Council (Tr. 142) and, on March 17, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 7-10.

## II. Evidence

### A. Personal and Vocational Evidence

Stargen was born in 1967 and was 33 years old on the date her application was filed. Tr. 169. She graduated from high school and has no past relevant work. Tr. 1108.

### B. Relevant Medical Evidence

Stargen was treated by her primary care physician, Jean Dib, M.D., from January 2010 through January 2015, for, among other things, diabetes mellitus and asthma. See, e.g., Tr. 420, 621. She had a severe exacerbation of asthma in December 2010 (Tr. 406) after a sinus infection (Tr. 407) and Dr. Dib changed her asthma medication (Tr. 406), which resolved her symptoms (Tr. 405).

In March 2011 she saw Dr. Dib for clearance prior to a scheduled knee surgery. Tr. 403. Dr. Dib stated that Stargen had obstructive sleep apnea and a history of COPD and asthma, and that she did not take her medications. Tr. 403. Nor did she or had she used her CPAP machine. Tr. 403, 412.

On May 3, 2011, Stargen had left knee replacement surgery. Tr. 400. On May 23, Stargen told Dr. Dib that she had developed left knee pain a week prior. Tr. 399. Dr. Dib observed that she had refused antibiotics while in the hospital. Tr. 399. He advised that she use her cane or walker and he gave her Percocet. Tr. 399.

In August 2011, Stargen complained to Dr. Dib of lower back pain radiating to her left leg. Tr. 396. He ordered an MRI, which showed mild facet arthritis in Stargen's lower lumbar spine with no disc bulge, no canal stenosis, and no foraminal narrowing. Tr. 341. Stargen asked Dr. Dib for a prescription for a cane, which he provided. Tr. 395.

Stargen did not complain of any knee pain in her October 17, 2011, appointment with Dr. Dib, but did complain of "severe pain in the right hip area mainly when she stands on it." Tr. 393. Upon exam, she had clear lungs, no joint, bone or muscle tenderness, no edema, and some tenderness in her right foot. Tr. 393. On October 19, 2011, Stargen's orthopedist Thomas A. Krupko, M.D., remarked that her left knee was doing great. Tr. 459. Stargen reported pain in her right knee, and Dr. Krupko advised that she lose weight and exercise to improve it. Tr. 459.

On April 25, 2012, Dr. Dib observed that Stargen's asthma was under good control with medication, her diabetes appeared to be stable with current management, and her other medical problems were stable. Tr. 389.

On June 28, 2012, Stargen saw Dr. Dib reporting right knee pain after she bumped it when she almost fell down from a roller coaster the day before when she was at a water park. Tr. 388.

On January 24, 2014, Stargen complained of anxiety after she lost all of her medications in a house fire. Tr. 656. Dr. Dib started her on Xanax. Tr. 656.

On March 17, 2014, Stargen started treating with pulmonologist Abdul Basit, M.D. Tr. 522. She stated that she had shortness of breath while she had been in New Orleans and also reported fatigue. Tr. 522. Dr. Basit observed that she had been diagnosed with obstructive sleep apnea but had not used her CPAP machine for two years. Tr. 522. Upon exam, she had normal findings: her lungs were clear to auscultation, she had no rhonchi with inspiratory breathing, no clubbing, cyanosis, or edema in her extremities, intact sensation, and normal motor strength. Tr. 524.

On June 2, 2014, Stargen saw Dr. Dib and complained of severe depression which was getting worse. Tr. 637. He started her on Zoloft. Tr. 637.

On January 19, 2015, Stargen saw Dr. Dib stating that she had had anxiety attacks. Tr. 621. He started her on Celexa. Tr. 621.

On December 21, 2015, Stargen went to the Alliance Community Hospital complaining of fever, chills, cough, congestion, and body aches. Tr. 806. Upon exam, she was in no respiratory distress and had no accessory muscle use or wheezing. Tr. 806. She had normal, non-tender range of motion in her extremities and normal gait, strength, and sensation. Tr. 806-807. She was oriented, calm, and had a normal affect. Tr. 807. She was discharged home stable with bronchitis and asthma. Tr. 808.

### C. Relevant Medical Opinion Evidence

#### 1. Treating Source Opinion

On February 18, 2016, Dr. Dib completed forms on behalf of Stargen. Tr. 797. Dr. Dib opined that, due to her severe, persistent asthma, which caused coughing, wheezing, and shortness of breath, and her obstructive pulmonary disease, Stargen could only stand or sit for 15 minutes, could occasionally lift and carry 5 pounds, could rarely lift 10 pounds, could work no

hours per day, would need to lie down less than one hour a day, and would need to elevate her legs. Tr. 797-800, 802.

### 2. Consultative Examiner Drs. Lyall and Harvan

Dr. Lyall: On March 12, 2001, Stargen saw James M. Lyall, Ph.D., for a psychological consultative examination in connection with her initial disability application. Tr. 319-322. Stargen reported audio and visual hallucinations and depression. Tr. 320. Throughout most of the assessment, Stargen sat and stared into space and the examiner's questions had to be repeated to her a number of times. Tr. 320, 322. She reported that she had no friends and spent her time with her imaginary friend, Donald, who talked to her constantly. Tr. 320. She also sang and danced with Donald. Tr. 320. Her husband's mother comes to her house to do the cooking and cleaning because when Stargen tries to cook "it just burns up." Tr. 320. She could not identify even one letter of the alphabet. Tr. 321. Her husband, who brought her to the exam and was also on SSI disability, stated that he was going to divorce her because she was too sick, she talked to UFOs, and she tried to stab him in his sleep. Tr. 319. Dr. Lyall encouraged Stargen's husband to take her to the local mental health center for evaluation and treatment of her current psychotic condition. Tr. 322.

Dr. Harvan: On May 1, 2013, Stargen saw Michael J. Harvan, Ph. D., for another psychological consultative examination. Tr. 471-477. Her adult son had to help her into the examination room by holding her arm. Tr. 471. She walked with a cane and carried a stuffed animal, a cat named Jerald. Tr. 471. She had difficulty breathing when she sat down on the couch and her son had to administer a breathing treatment via a nebulizer, which he set up in the office, and, after five minutes, the examination continued. Tr. 471, 474. Stargen stated that her mother was 18 or 19 years old, she did not know how old her son was, she did not know how old

she was, and she did not answer what her marital status was, stating that she is "by myself." Tr. 472. She was unable to respond to other simple questions (e.g., she did not know the year, month, or the name of any U.S. President in the last 50 years) and she said her stuffed cat, Jerald, talked to her. Tr. 472-474. When Dr. Harvan asked her to raise her right hand, she raised Jerald's right paw. Tr. 475. She stated that she lived alone and that her son and his girlfriend come over to do chores and put her to bed. Tr. 472-473. She went to church every Sunday. Tr. 473. She stated that Dr. Dib was the one who put her on her mental health medications but she did not know why she was on them. Tr. 473. She cried during the exam, Tr. 472, and exhibited what Dr. Harvan characterized as "bizarre behaviors." Tr. 477.

### 3. CDI Investigative Report

On October 28, 2013, CDIU investigators witnessed Stargen driving her car alone, going to McDonald's and ordering food through the drive through, talking on her phone, walking with a normal gait and without the use of a cane, and traversing stairs without assistance or difficulty. Tr. 530-532. When questioned by the investigators on an unrelated law enforcement matter while she sat on the front porch of her house, Stargen answered all the investigators' questions and asked questions of her own. Tr. 531. There were no long delays prior to her answers and she did not request the investigators simplify any of their questions. Tr. 531. She maintained appropriate eye contact and was able to read the name written on a photograph presented to her. Tr. 531. She did not carry a stuffed toy and one was not observed in the area around her. Tr. 532. She stated that she lived with her husband and explained where he was, what he was doing and with whom, and when he would be back. Tr. 532. During this time, Stargen's neighbors came over and she talked and joked with them. Tr. 532. She told the investigators that she had

6

been on her way to the grocery store earlier and remarked that she and her husband were "always in and out of their home" because they ran errands often during the day.  Tr. 532.

### 4. Consultative Examiner Dr. Gruenfeld

On August 6, 2014, Stargen saw Kenneth Gruenfeld, Psy. D., for another psychological consultative exam.  Tr. 494-499.  She stated that she had been married for 15 years.  Tr. 494.  Stargen reported that she gets her medication from her family physician and had been taking Zoloft for 4-5 months.  Tr. 495.  Her medication is helpful for her depression.  Tr. 495.  She drives, performs household chores, manages her finances with the assistance of her husband and son, sings in the church choir, and chats with others online using her computer.  Tr. 495-496.  After an examination, Dr. Gruenfeld opined that Stargen could understand and perform simple and moderate routine work without strict production requirements, average social requirements, and within the low to medium stress range.  Tr. 498.

## D. Testimonial Evidence

### 1. Stargen's Testimony

Stargen was represented by counsel and testified at the administrative hearing.  Tr. 1108-1120.  She testified that she has a driver's license and lives in a house with her husband.  Tr. 1108-1109.  She has an adult son.  Tr. 1109.  She has been on and off with her husband, explaining that they had lived separately for a time in the past but had continued to visit one another, and she moved back in with him in 2014, after they both got on medication.  Tr. 1120.  Things have improved for her since she has been on her medication.  Tr. 1120.  She listed her medications: insulin for her diabetes; tramadol, flexeril and naproxen for pain; inhalers and a nebulizer for her asthma; blood pressure and heart medication; and Zoloft and another medication for her depression and anxiety.  Tr. 1109-1110.

Stargen stated that her diabetes was "not good." Tr. 1111. Her blood sugar gets too high about 2-3 times a week; when it does, her arms and toes get tingly and she gets lightheaded for about an hour. Tr. 1111-1112. When it gets too high she drinks water and takes shots and when it gets too low she drinks some orange juice. Tr. 1112. A few years prior she had lost some weight but she gained it back because her providers kept putting her on prednisone for her breathing problems. Tr. 1112-1113. Lately, her blood pressure has been high even with her medication. Tr. 1113. When it is, she gets hot and agitated for a couple of hours. Tr. 1113. To cope, she rests and takes her medications. Tr. 1113. She has knee pain when she walks too far. Tr. 1113. Too far is "down this hallway, it's not healthy." Tr. 1113. Her breathing problems also affect her ability to walk. Tr. 1113. Her medications help her knee pain to an extent. Tr. 1113. Also, she will apply ice, heat, rub, and "elevate it." Tr. 1114. She elevates her legs "practically all day if I'm not doing anything." Tr. 1114. Her legs and knees swell every day. Tr. 1114. She has to sit with her knees extended in front of her. Tr. 1114.

Stargen had her left knee replaced in 2011. Tr. 1114. Currently, she is going to appointments about having her right knee replaced. Tr. 1114. Activities that aggravate her breathing include walking and lifting. Tr. 1115. Her breathing is bad in the summertime and wintertime and cleaning and dust also bother her. Tr. 1115-1116. She does not do well with stairs because of her knees and her breathing. Tr. 1115-1116. She has a rescue inhaler and uses it about three times a day. Tr. 1116. She has a heart condition that her cardiologist tells her is due to her weight; Stargen is about 5 feet, 6 inches tall and weighs about 320 pounds. Tr. 1116, 1108.

Stargen takes medication for depression, which Dr. Dib prescribes, and which she needs because she gets some anxiety a lot and will have anxiety attacks. Tr. 1117. During a panic

8

attack she feels like she might hyperventilate; it seems like she can't breathe, she is suffocating, and she gets really hot. Tr. 1117. They are triggered by when she is doing too much and overexerts herself. Tr. 1117. The medication helps her when she has a panic attack; she also tries to sit down and rest. Tr. 1117. She has three or four attacks per week. Tr. 1117. When asked if Dr. Dib ever suggested that she talk to a counselor, Stargen stated, "Well, at this point in time, we're thinking—he's trying to push at that." Tr. 1117.

On a typical day, Stargen is at home with her husband, who is also on disability, although she does not know what his disability is. Tr. 1118. Both she and her husband try to do the chores around the house. Tr. 1118. She can cook and do laundry, although she has to rest for periods of time. Tr. 1118. She tries to drive a car every day and will if she feels good. Tr. 1118. She will drive to the doctor, the grocery store, or her parents' house. Tr. 1118. She can go to the grocery store by herself and uses a motorized cart while in the store. Tr. 1119. Her parents live nearby as does her son, and he helps her. Tr. 1119.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Mark Anderson testified at the hearing. Tr. 1121-1127. The ALJ confirmed that Stargen had no past relevant work. Tr. 1122. The ALJ asked the VE to determine whether a hypothetical individual with Stargen's age and education could perform work if the individual had the following characteristics: can lift, carry, push and pull ten pounds occasionally and five pounds frequently; can sit for six hours, stand and/or walk for 2 hours; cannot climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop and crouch; cannot kneel or crawl; must avoid concentrated exposure to dust, fumes, gases, odors and poorly ventilated areas, and temperature extremes of hot, cold and humidity; must avoid workplace hazards such as unprotected heights or exposure to dangerous

moving machinery; is limited to simple, routine tasks that can be learned in 30 days or less; and cannot perform piece rate work or assembly line work. Tr. 1122-1123. The VE answered that such an individual could perform work as a patcher (182,000 national jobs; 15,000 Ohio jobs; 3,000 regional jobs); touchup screener (158,000 national jobs; 5,200 Ohio jobs; 1,700 regional jobs); and bonder (110,000 national jobs; 10,000 Ohio jobs; 2,500 regional jobs). Tr. 1124.

The ALJ asked the VE if the jobs he identified would still be available if the individual described above had to elevate both legs directly in front of her at waist level for one hour during the morning shift and one hour during the afternoon shift. Tr. 1124. The VE answered that such an individual could not perform work. Tr. 1124. The ALJ asked the VE whether the first individual he described could perform the jobs identified by the VE if the individual would be off task 33% of the time and VE answered that such an individual could perform no work. Tr. 1125.

Next, Stargen's attorney asked the VE whether the first individual described by the ALJ could perform work if that individual was further limited by being able to only sit, stand or walk no more than 15 minutes at a time and would need to change positions and alternate between those positions. Tr. 1126. The VE answered that the sitting and standing would not change his answer but the walking would to the extent that the individual would be walking away from the workstation more than nine minutes and, if so, could not perform work. Tr. 1126. Stargen's attorney asked the VE for his opinion if, instead of the former limitation described above, the individual would need to take three extra 15-minute breaks throughout the day. Tr. 1126. The VE stated that there would be no work because the individual would be off task for 45 minutes, which would be unacceptable. Tr. 1126.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his May 27, 2016, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since January 24, 2001, the application date. Tr. 150.

2. From the application date through December 31, 2009, there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. Tr. 150.

3. As of January 1, 2010, the claimant has the following severe impairments: obesity, diabetes mellitus, asthma, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), cardiomegaly, hypertension, bilateral degenerative joint disease of the knees, lumbar osteoarthritis, depression, and an anxiety disorder. Tr. 155.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 155.

5. As of January 1, 2010, the claimant has the residual functional capacity to perform a reduced range of sedentary work as defined in 20 CFR 416.967(a) except she cannot climb ladders, ropes or scaffolds. She can occasionally climb ramps and stairs. She can occasionally stoop and crouch. She cannot kneel or crawl. She should avoid concentrated exposure to dusts, fumes, gases, odors and poorly ventilated areas. She should avoid concentrated exposure to temperature extremes of hot, cold and humidity. She should avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. She is limited to simple, routine tasks that can be learned

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

in thirty days or less. She cannot perform piece rate work or assembly line work. Tr. 159.

6. The claimant has no past relevant work. Tr. 168.

7. The claimant was born in 1967 and was 33 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 169.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 169.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 169.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that [exist] in significant numbers in the national economy that the claimant can perform. Tr. 169.

11. The claimant has not been under a disability, as defined in the Social Security Act, since January 1, 2001, the date the application was filed. Tr. 170.

## V. Plaintiff's Arguments

Stargen challenges the ALJ's decision on three grounds: the ALJ followed an out-of-date standard when finding that Stargen committed fraud or similar fault; the ALJ did not follow the treating physician rule with respect to Dr. Dib's opinion; and the ALJ erred when he dismissed the opinions of two consultative examiners. Doc. 11, pp. 8-12.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### VII. Analysis

#### A. The ALJ did not err when he evaluated whether Stargen committed fraud or similar fault

Stargen argues that the ALJ applied the wrong SSR ruling when he evaluated whether she committed fraud or similar fault. Tr. 11, p. 8. She states that the ALJ cited SSR 00-2p in his decision, asserts that SSR 16-2p became the operative ruling prior to the ALJ's decision, and contends that the ALJ should have relied on SSR 16-2p. Doc. 11, p. 8. Beyond complaining that the ALJ cited SSR 00-2p, Stargen offers little explanation of why the ALJ's decision was erroneous. She claims that there is a "complete and total lack of any evidence that [Stargen] knowingly provided false information at any point in this matter." Doc. 11, p. 8.

Stargen's argument is without merit. First, while it is true that the boilerplate language in the ALJ's decision cites SSR 00-2p, the ALJ recited the correct standard: a similar fault finding must be shown by a preponderance of the evidence and cannot be based on speculation or suspicion (Tr. 150); and cited the correct statute and accompanying definition: similar fault is involved if an incorrect or incomplete statement that is material to the determination is knowingly made or if information that is material to the determination is knowingly concealed. Tr. 150 (citing 42 U.S.C. § 405(u)(2)). In other words, the ALJ recited and applied the correct standard. *Compare* ALJ's decision (Tr. 150, "A 'similar fault' finding can be made only if there is reason to believe, based on a preponderance of the evidence, that the person committing the fault knew that the evidence provided was false or incomplete.... [and] cannot be based on

14

speculation or suspicion." *with* SSR 16-2p, 2016 WL 1029285, at *3 ("A finding of similar fault can be made only if there is reason to believe that, based on a preponderance of the evidence, the person committing the fault knew that the evidence provided was false or incomplete. We cannot base a finding of similar fault on speculation or suspicion.").

Stargen argues that the ALJ "based his conclusion on nothing other than speculation and suspicion stemming from the report of a one-day investigation by the CDIU. There is no evidence whatsoever, and none discussed in the decision, indicating that Ms. Stargen knowingly provided false information." Doc. 11, p. 8. The Court disagrees. The ALJ, in an exhaustive and careful explanation, detailed the preponderance of the record evidence in support of his conclusion that Stargen engaged in fraud and similar fault and did not rely only on the CDIU investigation (see Tr. 151-154). Absent a specific challenge, which Stargen does not posit, the Court will not rehash the ALJ's four pages of findings. The ALJ did not err in finding fraud and similar fault.

Stargen's related argument is that the ALJ erred when he disregarded the opinions of two psychiatric consultative examiners. Doc. 11, p. 11. The ALJ disregarded the opinions of the two psychiatric consultative examiners, Drs. Lyall and Harvan, based on his finding that Stargen committed fraud and similar fault when she interacted with these two examiners. Tr. 154-155. Because the ALJ did not err in finding fraud and similar fault, he did not err in disregarding this evidence based on Stargen's fraud and similar fault. *See* 42 U.S.C. § 405(u)(1)(B)("the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence."). The ALJ did not err when he disregarded the opinions of Drs. Lyall and Harvan.

**B. The ALJ did not err when he considered Dr. Dib's opinion**

Stargen argues that the ALJ erred because he did not follow the treating physician rule with respect to Dr. Dib's opinion. Doc. 11, p. 9. Beyond complaining that the ALJ did not follow the regulations in general, she identifies only one specific reason why the ALJ's consideration was improper: he relied on the fact that Stargen visited a water park. Doc. 11, p. 10.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

The ALJ did not give controlling weight to Dr. Dib's opinion because he found it was inconsistent with and not supported by the evidentiary record, including Dr. Dib's own treatment notes, and the ALJ spent three pages discussing the reasons why. Tr. 164-166. The reasons included objective test results, objective examination findings, the treatment provided, Stargen's repeated non-compliance with treatment, improvement with medication compliance, Stargen's statements, and her activities of daily living. Tr. 164-166. Prior to spending three pages

16

explaining the weight he gave to Dr. Dib's opinion, the ALJ spent another four pages reciting Stargen's medical history, including identifying Dr. Dib as Stargen's primary care physician who had been treating her regularly since at least 2010. Tr. 159-163. Among other things, the ALJ observed, in these seven pages, that Stargen visited a water park. See Tr. 160. Stargen does not disagree that she visited a water park and the ALJ's observation is not error.

In other words, the ALJ complied with the treating physician rule, *see Wilson*, 378 F.3d at 544, and his findings are supported by substantial evidence and must, therefore, be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court defers to the agency's decision so long as substantial evidence supports the ALJ's conclusion).

### VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

IT IS SO ORDERED.

Dated: May 15, 2018

Kathleen B. Burke
United States Magistrate Judge